Company, et al. Arguments not to exceed 15 minutes per side. Mr. Herron, for the appellant, you may proceed. Thank you. Good morning, your honors. Good morning. Please, the court, counsel. On Monday, the Supreme Court issued a decision as to whether or not to amend the Toland v. Cotton case, which was very critical, I think, of the way that the summary judgment was approached in this case by the district court. And that's the clear misapprehension, and that's the language that the court used, of how the summary judgment standards are supposed to be applied. And in that case, they summarily accepted, cert, and reversed, and remanded, not even hearing argument, I believe, because the misapprehension was that bad. And I think we've got the same problem in this case. There's a 5-minute, from a factual perspective, there's a 5-minute window in this case of the events that occurred between Ms. Goodsite and Mr. Roscovich on June 10th of 2010, where the parties' account as to what happened is diametrically opposite to each other, as to whether... There are, I mean, certainly the evidence in this case creates, there are some genuine issues of fact. I think the that's kind of an overarching question that I have about some of the arguments in the case. Well, the principal issue as to what did or did not happen on June 10th is whether or not Ms. Goodsite asked for permission to leave and was given permission to leave. She testifies that she was. I mean, to leave his office or to walk off the job, I mean, that's one of them. I mean, I agree, we have to assume, she says, may I be excused. But, you know, is it reasonable to construe that to mean may I leave the worksite premises altogether? That's not so clear. And I think that's the question that a jury needs to decide. What one person wants to construe as to how that conversation should be interpreted is not a law. But if she said may I step outside your office, I mean, would you concede if she then leaves the worksite that that would be unexcused absence from work? If she were to simply say may I step outside your office, I don't think that would be indicating can I leave. It's different from may I be excused. I mean, so in that case, would you agree that the employer, you know, if they did everything else here, that that's a proper termination because she left, walked off the job? If she were to have said just simply may I step out and not indicated may I be excused, I think that would be a different issue. But that's not what we have here. We have here her coming in with her handbag, with her bag. We have this heated discussion about whether or not the graffiti had been removed. We have Mr. Roscovich submitting that he was angered and upset with her at what he perceived as an allegation that she was making, that he was lying about having done that. We have from that, we certainly can't infer that there would have been a retaliatory intent. She asked if she could be excused. Her testimony is he said yes. Now is it a reasonable conclusion from that that she was asking to be excused from work? She had a history of not wanting to work the single positions that she had made quite clear, and he was very well aware of that. There's no dispute in the record as to that. That she had manipulated her attendance at work for months to not do that job. I mean, doesn't that suggest that she actually just refused to do it and that's why she left that day rather than getting permission? Well, I wouldn't use the term manipulated because there's never been any indication that she was acting improper in doing that, in calling off or changing or working out different shifts. She had the right to do that under the collective bargaining agreement and they have never contended that that was improper. So the word manipulating your schedule, I think misconstrues what is going on here. In the past, had he ever excused her from working in a particular position? Well, when she had, as Judge Kethledge was alluding to, changed around her schedule to accommodate her preferences, she was never denied the opportunity to do that because I believe she did have a right under the bargaining agreement to do that. And to avoid working in certain situations with certain people? Correct. The people that she had thought might have been responsible for the graffiti, the people that she had pointed out specifically with respect to the train sabotage, those were the ones that she did not want to work with. Well, I mean, I understand certainly that you're arguing her dismissal was a retaliatory action. Correct. But some of these prior actions, which I think you're also saying are retaliatory, the graffiti, I mean, it is undisputed, isn't it, that in response, Roscovics tells all the workers that that stuff's not going to be tolerated. He tells the supervisor, I guess, to paint it over. He tells the supervisor to check the bathroom daily, I think, to see if there's graffiti. And that she doesn't complain further between January of 2010 and June 2010. Are those all, is that common ground in this case, factually? No, because she had complained before June 10, 2010 about the second round of graffiti that occurred. When was that complaint? Oh, that was in, I don't remember the dates right off the top of my head. She had made a complaint to the EEO office. She had filed an EEOC charge May 7th. She had made some additional complaints to the EEO office about the new graffiti. But she doesn't go back to Roscovics with respect to his responsibility, rather, as the rail yard manager. It's his ultimate responsibility to make sure that it's removed and that it doesn't occur again. And her testimony is it wasn't removed. But my question is temporal. Does she, she goes to Roscovics in January. He does all those things. Which seems to show he's taking it seriously. She doesn't go back to him for another five months to say it's not cleaned up or they're still doing this. Right? Right. But she goes back with a second complaint about the graffiti in either late May or early June, which is itself another protected act. She had made the EEOC charge on May 7th was when it was filed. I don't know when it was received by Norfolk Southern. That's another protected act. And the issues that were raised during the conversation on June 10th between her and Mr. Roscovics and the EEO officer from Norfolk Southern, Ms. Decker, those are also protected acts. How do you connect? I mean, I understand your point that there's testimony that Roscovics is mad when he's accused of lying. I mean, not an unusual reaction, but attribute that to him. How do we then attribute this sort of retaliatory motive then to what's the guy's name? I think it's Swaney or something? Swaney? How do we then sort of, all right, you know, seven weeks later, Swaney drives up from Alabama, has a meeting. To my knowledge, he never speaks with Roscovics. There's no evidence of any concerted action between him and Roscovics that I can see. And that's why I'm asking you, because you know the record better than I do. How do you connect his decision to terminate? And I know you don't like the procedures, but how does he become sort of an avatar for Roscovics? Well, I don't have an issue with the procedure. The Rule 29 procedure is set out in their bargaining agreement, and it's a lot better protection than a lot of people have. But even that hearing, if you review the hearing transcript from the Rule 29 hearing, that still boils down to Roscovics' account as to what happened on June 10th versus Ms. Goodside's account as to what happened on June 10th. But Swaney has to be acting in retaliation, right? No. Swaney does not have to be acting in retaliation in order for the cat's paw. That's the cat's paw issue, where you have a biased supervisor whose actions influence an unbiased final decision maker. What do you mean by influence there? I mean, I thought influence was sort of, you know, the one person sort of can get the vibe that this is what the boss wants and they do it, even though they don't share the emotion, so to speak. I'm not saying that they're required to share the emotions. They're required only to act upon those emotions, even if they don't know that there's a bias. How does he act upon some, you know, flash of anger that Roscovics has in the June 10 meeting when he doesn't have a clue that that flash of anger happened, or did he? Well, under this court's precedent on the cat's paw, he's not required to. But how do you, I mean, how does he become a cat's paw when he doesn't, you know, there's no connection between Roscovics' motives and this guy's actions in any way? He just takes a separate look at it and says, you know, you shouldn't have walked off the job, which is what about four different bodies said. Well, there's a two-part question there. As for Mr. Sweeney, he had to decide between Mr. Roscovics' account of what happened, he had to decide between Ms. Goodside's account of what happened. I think as you alluded to earlier, there are issues of fact as to what was said and what was meant on June 10th. There is evidence in the record that shows that Roscovics could be found to have had a retaliatory animus. That retaliatory animus is reflected in his testimony at the Rule 29 hearing as to his account of what happened. And Mr. Sweeney had to make a choice between who he believed. Did he believe Mr. Roscovics? Did he believe Ms. Goodside? And if Mr. Roscovics' testimony comes from... I want to keep your rebuttal because we've got to move it along. Thank you, Mr. Herron. Your answers are very helpful. We'll hear from Ms. Hartman. Good morning, Your Honors. I'm Heidi Hartman. I represent Norfolk Southern Railway Company and Mr. Roscovics, the general foreman at the Bellevue Railroad Yard in Bellevue, Ohio. We believe that the facts in this case and the record supports viewing it as a straightforward retaliatory discharge case based on her removal from service and her discharge, not these other secondary issues that Mr. Herron raises in his brief. We think this is the type of case that is precisely contemplated by the Supreme Court in Nassar as the type of case that is appropriate for summary judgment. Just because an adverse employment action exists and just because there is some protected activity, that doesn't mean that there's any link between the two. That's what we really need to look at here and that's what's totally lacking in this case. We think that there are three very important and undisputed facts that provide the framework for what we think your decision should be in this case. First of all, before the decision to discipline or penalize Ms. Goodsight was made, she had an opportunity to have a full, fair, thorough hearing before an impartial hearing officer, and that is Mr. Sweeney. That's pursuant to the collective bargaining agreement between her union and the company, and that's what Mr. Herron admits today gives her better protection than most people. This is an extremely unique procedure. Before any decision is made to discipline an employee under their procedures, they're given a hearing. They're given the opportunity to sit and listen to all of the evidence that either supports or... Well, I acknowledge that in this court's Chapman case, there is not a per se defense because of an independent investigation. However, I think if there were any defense available to any employer, this is the case where it could be in existence because we have an impartial hearing officer coming from another part of the country... Right, but to me that sounds like argument for a jury. It's a factor, but it doesn't cut off your liability. I mean, the cases still say there can be cat's paw liability. Sure, but they say that that's the case under two other circumstances. First, where there is retaliatory intent, and second, where there is proof of proximate cause, and there's no retaliatory intent on the record here. Mr. Heron has characterized Mr. Roskovich's feelings as anger. That's not supported by the record. If you look at... Again, I'm sorry, but it's sounding like jury argument to me. You're saying that there's no genuine issue whether he had retaliatory intent? Well, he said he was not angry. Well, I'd be surprised if he said he was. He admitted to being offended and upset, but that doesn't give him an intent to retaliate against... Okay, so I'm just asking you a question. Are you saying there's no genuine issue on retaliatory intent? I am. I mean, remember, we have to look at the facts in the light most favorable to Ms. Goodsight, and in the short time you have at the podium, I would focus on the facts so viewed. Well, I agree that we have to look at the facts in the light most favorable to her. I don't think that there is a reasonable inference that can be drawn from her statement, may I be excused, that she had authorization to leave. That's another one of the undisputed important facts that I'd like you to keep in mind as you consider this case. That is, she admitted that she left the premises without telling any supervisor, including Mr. Roskovich's, that she intended to leave. On that point, why is it in your opinion that a juror could not construe this alleged may I be excused, yes, exchange as her being excused to leave the work site altogether? Well, I think we have to look at what she asked. She didn't say may I be excused from work, may I be excused from the shift, may I use a vacation day or personal day to not work today. She was in a closed door meeting. She had been told to do a job that she didn't want to do. She came to Mr. Roskovich's office seeking the opportunity to be relieved from that. He had a discussion with her and the EEO officer where neither of those two Norfolk Southern employees gave her authorization not to work that job. They told her the job was safe, that they were seated with Mr. Roskovich's only. She asked for relief from that position and he told her no, I expect you to do the job. You're not going to get relief from that job. She said may I be excused. They were in a closed door office. She walked out of the office. And if you look at the rest of the record, that the rest of the record does not support any finding that Mr. Roskovich's expected her to be gone. He was in his office. Mr. Davis came to his office and discussed what had happened during the safety meeting where Ms. Goodsight openly refused to do the job that she had been assigned. And Mr. Roskovich said well let's go get her and bring her back and talk to her because he expected her to be out working the job that he told her she had to do. So they go and they look for her. The actions of Mr. Davis and Mr. Roskovich's neither of which are contradicted. They're out looking for her 20 minutes. They discover that she's gone. Mr. Davis continues to look for her for the rest of the night. Mr. Roskovich's has to go and shut down another job inside the... But you said Mr. Davis what? Continues to look for her? Continued to check around the yard to see if she came back because they didn't expect her to not be there. Is the relevant question whether she thought she had permission to leave or whether they thought they gave permission to leave? I think it's whether they thought they gave her permission to leave. And why do you think? Because... It makes sense but why do you think? This goes to the argument of pretext, Your Honor. I think that judging the facts as they are on the record, this employer, Mr. Sweeney on behalf of the employer, had an honest belief that Ms. Goodsight did not have authorization to leave and therefore she violated Norfolk Southern's conduct and safety rules by leaving without authorization. Now he told... Roskovich said that he didn't have that conversation with her, right? Roskovich said that she did not ask. May I be excused? Okay. So... And let's assume that she did. Of course. As we have to do. So the fact that he denied it, is that some indication that he had animus and is that... because the decision maker was relying on his account? I don't believe so. First of all, there is no evidence that he was being untruthful. There is a issue of fact between her and him. They don't agree that she asked, may I be excused? He... even if she asked, may I be excused, again, looking at the record, the full record, all the facts in the record, it doesn't suggest that she had permission, even if he said yes, to leave the premises. What it gives... the inference that it raises is that she had permission to leave his office. And to stop the discussion that they were having with which she was quite unpleased. The Honest Belief Doctrine, I think, provides a basis for granting our motion for summary judgment. Mr. Swaney was able to take... to hear Ms. Goodsight offer extensive explanation for what happened. She was able to offer witnesses on her behalf. She and all three of her union representatives were permitted to question all of the witnesses, including Mr. Roscovics, in front of Mr. Swaney. She was permitted to make arguments. Her representatives also made arguments. They had a full and fair opportunity to present all the facts to Mr. Swaney. And Mr. Swaney relied on the particularized facts that were before him, which include, first, her admission that she left without telling anyone that she was leaving. You know, if you don't tell someone that you're leaving, you can't really reasonably expect them to know that you did. And the facts here show that they didn't know that she left. Also, look at her admission that she was openly insubordinate to Mr. Davis during that safety meeting. She refused to do the job that he assigned her to do on more than one occasion in front of her co-workers. Well, she believed that he was changing the rules. Right? She believed... No, I don't believe that's the case. She believed that he wasn't assigning the position to her properly under their seniority system. That's what I mean. And that's the same argument that she had been making all along. There wasn't a change. She just believed that when she bid for the yard position on second shift, she waited to do it until she thought that she held enough seniority to hold the job that she preferred, the job that let her walk around and get exercise. When that became not the case because other individuals bid to the same shift and they had greater seniority than her, it became the circumstance that sometimes she had to do this job that involved driving around in a truck for the shift and not getting the exercise that she preferred getting. And she didn't like that. And so she did, as Judge said, there were days, probation days or personal days when it was clear that she didn't have the seniority to hold the job that she wanted to do. I don't disagree that she had the time available to her. She could use it the way she wanted to, but she gave this employer notice that she was not going to show up and do the job so they could cover it. They had employees who could work and not leave them in the lurch the way that she did on June 10th when she just walked off the job without telling anybody that she didn't intend to work. I don't have anything further unless you have further questions for me. Thank you. Thank you. We'll hear from Mr. Herron. Thank you. I want to pick up on a point that Judge Kessler, I think you were getting at this when my time ran out originally, was the parade of witnesses before Mr. Roscovics and Ms. Goodside had their meeting when she was initially saying I'm not going to do this job in front of Mr. Davis and the coworkers. That's not insubordination and it's a mistake to characterize it as that because Mr. Davis has testified that the proper procedure, if that is the situation, was for her to go to Mr. Roscovics and see if she could get him to change the shift. But more significantly, those actions that counsel has characterized as insubordinate occurred before the meeting with Mr. Roscovics, before the conversation with Ms. Decker, before the issues regarding the graffiti came up, before the allegation that was made that Mr. Roscovics may have been lying about having removed the graffiti, and before his admissions that he was offended and upset with her for telling Mr. Davis and the other coworkers, no I'm not going to do my job, then walking off. Even if there had been other protected activity right up until that minute, that would be insubordination. But Davis isn't the one that set the process in motion, Roscovics did. How exactly do you contend that Roscovics quote influenced Sweeney for purposes of the cat's paw rule? Because it was Roscovics' testimony against Ms. Goodside's testimony as to what happened during that five minute period in his office. That was the only evidence that Mr. Sweeney had to consider, it was her word against his. It's an evidentiary influence. I mean, he just believes his testimony rather than hers. That's what it boiled down to. Some of this court's decisions that have... Is that your pretext? Yeah, that would be actual pretext, yes. The insubordination did not occur. Because the independent fact finder finds one or the other testimony more believable than the other? Correct. And if he chooses to believe Mr. Roscovics' assessment, which he did, and Mr. Roscovics' testimony is tainted by his bias because of the events that had happened in that five minute meeting, ten minute meeting, however long it was, on June 10th, that taints the process. His testimony was swayed. Well, the jury would have to believe that Roscovics was lying and was motivated. Yes, they would. But the key word you said there, Judge, is if a jury believes. And that is a jury question, it's not a legal question. It can be resolved on summary. Okay. And why was it reasonable for her to think that his statement meant that she could leave the premises as opposed to his office? Because that's what she was asking. Can I leave? Her intent in asking that question was can I leave the premises? And again, how a jury wants to interpret that, they may say I'm dead wrong. They may say the railroad's dead wrong. But the point is that it's a jury's question to decide who meant what. We can't just decide on this record as a matter of law how to interpret those statements. Those are inherent factual issues. If he, oh, I'm sorry. I'm sorry. I thought you were, Gillies, get to go. Go ahead. Okay. If Raskovics had given an account of the incident that included her saying may I leave? If he said yeah, she said may I leave? And she left. Like left. And if that's the information that was given to Swanee, would you still have a cause of action? Well, if he's allowing her to leave. No, I'm asking you a different question. If Raskovics gave the same exact account that Goodside gave, the same exact account, if he said, you know, she came in, this is exactly what happened. She came in. We discussed this. She started talking about the graffiti. I got a little pissed off. And it was, you know, I didn't give her permission not to work the job. And she said, let me think, exactly what she said. She said, may I leave? And I said, yes, you can leave. And that's the last I saw of her. So he gives an account that is exactly like her account. Okay. If I understand your question correctly, my time's running out. If he asked if she could leave and she left but came back to work the next day, there wouldn't be a case because there wouldn't have been a termination. If he had said, yes, you can leave, and then decided to terminate her anyways, claiming he didn't say you could leave, then yes, there would be a case. I hope I'm understanding your question. I'm asking you if he gave Swanee the exact account that she gives and didn't lie about whether she asked to leave, would you still have a cat's paw case? Well, again, I'm not sure that that's going to make a difference because of what happened afterwards, which was the removal from service and the institution of the disciplinary proceedings. If I understand correctly, yes, she asked if she could leave, and I said, yes, she can leave, and that were the end of it, we wouldn't even be in a Rule 29 disciplinary proceeding because he would have given her permission to leave that day. And assuming she comes back to work the next day or when her next schedule shift is. Okay. What I'm saying is that he gives an account that is just like hers and he says, and then when she left, I believed that she was leaving without authorization because of the nature of our conversation. I did not understand myself as giving her permission to leave the premises. And then you have a hearing and she says, well, I understood it to be, and Swanee has all the facts. I mean, both of them are giving him the same facts and he makes a judgment. Is that, would that be a problem? Yes, I believe it still would. If there's still a retaliatory animus underlying his testimony at that Rule 29 hearing as to what happened, then yes, there still would be a cat's paw issue here. Okay. Even if it's, so is it the retaliatory animus underlying his testimony or underlying his choice of penalty or... It's, if you're referring to Mr. Rosick of his retaliatory animus again, it's his retaliatory animus in removing her from service and instituting the disciplinary proceedings under the collective bargaining agreement. Okay, so it's the instituting the disciplinary proceedings. And then his subsequent testimony at the hearing in support of his actions. If that too is tainted by his retaliatory animus, that can be imputed to Mr. Swanee, even though he personally may have had no bias or retaliatory animus against her. I see my time has long expired. Okay. Thank you, Mr. Chairman. Thank you, Your Honors. Those were all your very fine arguments. The case will be submitted. Clerk may call the next case.